Creative Choice Homes v. Amtax Holdings 690 All right, we'll hear first from Mr. Davenport. Good morning, Your Honors. David Davenport on behalf of the appellants. May it please the Court and Counsel. We've fully briefed the Low-Income Housing Tax Credit Program and how the program operates. And I would like to try to focus my argument today on materiality, cure, and removal, having been an extreme forfeiture. The breaches of the a period of a decade or more, there had been some payments at a turn, there had been some advances, there had been some accrued fees rather than payment of those fees. And there was no dispute about the breaches. The primary dispute before the Court below was, were these material? We submitted they were not. Obviously, the Court found otherwise. You had someone testify that they were. I think Barrett testified that they were material breaches. In a vacuum without context, that was the testimony. Against his own interest, too, right? Sure, but I think the exchange, Your Honor, was more along the lines, you know, in cross-examination where it's, you mean to tell me $100,000 isn't material? We all know that that's a material amount of money, but within the context of these two properties that were worth more than $50 million, $100,000 or even $250,000 over a 10 to 12-year period of time is not material. And within the context of their option rights, which would have allowed them to acquire the interest of a limited partner or to buy the property and, you know, reinstitute themselves as a sole owner after 15 years when the compliance period ended, it was less than 1%. Well, it might not be significant in terms of the amount at issue, but it's material in terms of it was a violation, as your client has admitted, of the agreement. Isn't that what makes it material, not the amount at issue? I think according to the Burlington case, Your Honor, from the Fifth District Court of Appeals, a material breach must involve the essence of the contract, and it must be of such significance that it relieves the non-breaching party of any of their obligations. In this particular instance, because these properties are developed under the Low Income Housing Tax Credit Program, the investors are in it for tax credits and losses. Their contribution to the partnerships are solely determined based on what they can anticipate to receive in tax credits and tax losses. And in this instance, they receive those credits, they receive those losses. It can't possibly mean that your client can just take whatever he wants. I mean... Definitely not. But that's basically what you're arguing. You're saying that it can't be material as long as they receive the tax credits. Well, in a vacuum, it could have been material if the amounts had been different. Well, how do we decide how much it has to be for it to be material? Fair question, right? I think on the facts of this case, given that we're dealing with a period of time of in excess of 12 years and 105,000 in one and 140-some thousand in the other, it's just not material under the facts of this case. As also illustrated... Can I ask you a quick question just about the interpretation of the agreement, the agreements? Is it clear that the breaches had to be material? For instance, under at least the Fountainview Agreement, it seems like materiality really  And that some of these breaches might be characterized within the former items in that series to which materiality does not attach. Am I wrong about that? I believe you said the Fountainview Agreement is... Yes. I'm looking at 815Ai. And it just says a limited partner can remove the general partner for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations to the general partner, provided that such a violation results in or is likely to result in material detriment to the impairment of. It seems like the first items in that series don't really even entail a materiality component. I could be wrong about this, but that's just the way I read the language of the agreement. That's not how the issues were framed below, Your Honor. Everything had to be determined material. So when we were on summary judgment, the questions that were left over for trial were, were these breaches material? There was no distinction made as you argued, and I don't believe they made that argument below, so they wouldn't be entitled to make that argument here. All of the breaches... District courts, I have, it was my understanding that the district court found in the alternative that even if it wasn't material, it was willful misconduct and there was basis for the ruling just on that finding alone and admission by your client alone. With all due respect, Your Honor, I believe that the court applied materiality to all the breaches, and they certainly found that the misconduct was willful because it had been knowingly done over a period of time. It wasn't as if it was just happening and nobody knew about it. In fact, the limited partners themselves knew about it because they received audited financial statements every year, and they saw that the fees were accruing, and they didn't ask to get paid. They saw that advances were being made prematurely prior to when the cash flow distributions otherwise would have been made, and they didn't challenge that, but the audited financial statements showed it year in and year out, and they didn't complain. That goes into why it was not material from our estimation because it wasn't until the Hunt Capital Partners folks came on the scene that they, in our estimation, used it as pretext to claim materiality. I believe the district court below properly applied the materiality standard to each of the factors, but wrongly concluded that the breaches were material. When we look at what happens then, there's an opportunity to cure. We don't believe that we were given the fair opportunity to cure because of the obstructionist kind of non-cooperative failure to apply with the duty of good faith and fair dealing, and frankly— Is it not true that your clients received notices from the limited partners at least two, if not three times, to which they never responded until the day of enforcement, and all of a sudden, that's when they get this promise that the money is coming? The default notice came on May 3rd, 2019, and the record below demonstrates that on May 29th, CCH's counsel contacted my colleague at bar, Mr. Griffin, and then there was a conversation between them on June 3rd, and at that time, my client's attorney let them know, we intend to cure. What had happened a couple of weeks earlier was they engaged the partnerships accounting firm, Baker and Tilly, to begin this forensics analysis to understand, okay, we have to pay them back because these new guys want to be paid, and this historical course of conduct has to be determined, so the accountants began that work within two weeks of receiving the letter. Can I ask you another cure question? This may be the most remedial question imaginable, so it's really for you and your colleague on the other side. I'm just having a hard time with the math, because it looks like the outstanding balance, so to speak, was somewhere in the $800,000 range, and that the cure offer that you're describing here totaled up to $200,000 and change. Why would that be sufficient? I might just be missing something so fundamental. Not at all, Your Honor, and I think part of it has to do with the unique nature of the LIHTC program and these partnerships agreements that implement them. The cash flow waterfall allows for annual distributions of available cash flow from operations. Ninety percent of that goes to the general partner, my client. Ten percent of that goes to the limited partner, so if the accountants determined, hey, there was $800,000 over the 10-year period of time, and you paid yourself early, you should have been paying them 10%. The cure is to pay them $80,000. They're not entitled to $800,000, and this two-step process that they describe is really an illusory process because what would happen is the general partner would then put $800,000 into the partnerships and immediately turn around and take 90% of that back for themselves and distribute 10% of that, so I think that may be the disconnect on the math because of the waterfall distribution. Okay, thank you. So it brings me to kind of where we end up at trial, right? So the timeline for the opportunity to cure and the effort to cure included telephone conversations among counsel, emails among counsel. Tell us what else you want. What else do you need? Send us wire instructions. We want to wire the money. No wire instructions ever came, right? No responsive, cooperative process. Well, I thought that was because the source of the money that was supposed to be repaid was also somehow a violation of the agreement or unacceptable. So in the conversation or in one of the emails, counsel for the general partner indicated that there was intended to be made a loan to the partnership to pay these monies back, but that's not what happened. Ultimately what happened was CCH Inc. wired money into the partnerships, we have the bank records and the accounting for that, and then that money was cut on a partnership check to the limited partners, which they kept, they endorsed, and they cashed. They never evaluated whether that was sufficient to address the cure. They never told us what amount was necessary to cure. We got to trial and we heard from Mr. Fussell that the amount necessary to cure was less than the checks that they ultimately received, cashed, and still have today. And so when we go and we look, okay, what's the cure, I would like to think the court sitting in equity would say to the party claiming that there's a default and you're going to remove somebody from their ability to acquire these properties after 15 years of service, will say, you know, you should have cooperated and you should tell them what's necessary to cure. Cooperate with them. Be a good partner. Okay? I'm not here and my client is not here to suggest that they didn't do anything wrong. They made mistakes. We obviously admitted a breach and it was a difficult trial to walk in and say, Judge, we breached. Right? But okay, I've got my hand behind my back, now let's talk about these other issues, right? And you know, it's a difficult set of circumstances when you're in the middle of a cure period. For Fountainview, there was an additional 60-day period. In the middle of that cure period, people physically showed up at the properties. I'm sorry, they didn't show up during the cure period. Yeah, they did. They showed up in 60 days and it was a 90-day period of time. They got their default notices about 45 days into that cure period. Now, admittedly, both properties have different cure periods, right? But I'm going to save my rest of the time for a bottle. Sorry, I missed the yellow light. All right. Thank you, Mr. Davenport. We'll hear next from Mr. Griffith. Before you get going, can you just tell me, like, do you agree with his waterfall explanation or response to my question about the math? I agree in concept that that is true, that the unique nature of the LIHTC program is that when cash goes back in, a disproportionate amount does go to the general partner through waterfalls. I don't believe there was a cure for several reasons, which I'll address. But it's not your contention that there was no cure because the money just wasn't enough? Oh, it is. Oh, okay. Yes. They did not cure. $600,000 short. Let's be perfectly clear. They did not cure. That's what the district court found as a factual matter. The cure did not take place. And may it please the court, Steve Griffith on behalf of the appellees, joined by George Van Biersen, who's the asset manager for these properties. This is actually a straightforward business dispute. One partner stole from the partnership, and the other partners kicked them out. That's it. And we can make it spicy. We can talk about LIHTC name-calling, and we can talk about fraudulent construction contracts. We can talk about options that didn't exist. But ultimately, a partner stole, was given notice, did not cure, and was removed. That's it. Well, you had a... I mean, there might be a difference between material and significant, but you had a relatively small amount of money at issue, and the optics could be interpreted as your clients took advantage, and now they do have a windfall. Well, and I think, first of all, Judge Abadou, you raised an excellent point in the argument a second ago about materiality, and if I could, I'd like to start there. I think it's important to frame it as to what happened, though, in the lower court. We moved for summary judgment on materiality, because we agree with Judge Newsom's question, at least. I don't think materiality applies here. The Fountainview Agreement is very clear that the materiality only applies to the negligence default. The other defaults for stealing, for fraud, malfeasance, we don't think it applies. What about the very last phrase of that sentence, that provision? I don't have it in front of me, but it uses the word material again. It does, but it refers to the violation. The immediately preceding violation in that phrase is the neglect of the property. It does not ... Well, I mean, it uses the word material twice, right? Correct. Correct. If it's using it the second time, it seems like it would be strange that it would refer to the immediately preceding phrase, because it also uses material. That's ultimately what the lower court determined to construe the Fountainview Agreement. I think the Park Terrace Agreement is even clearer, though, that materiality would not apply. Okay, but let's talk about the Fountain Agreement. Sure. No, absolutely. So, the reason why I don't think that materiality applies in Fountainview is that I think if you read that Romanette in its entirety, the reference and the qualifier that the conduct has to be material only refers to the very last of the default acts, which is just the neglect ... I think that's right with respect to the first use of material. Right. The question goes to the second use of material. We would construe it to also apply that reference still to just that last provision. I understand the court's position, though, and I would have to concede that that language is a lot closer, but ultimately, it wouldn't change the decision here, because even if the court finds that materiality applies to both, and again, Park Terrace, the language is even more favorable for us, I don't think there's much room for doubt that there's materiality. When we moved for summary judgment, the opposition that we received was, this is a fact question. It has to be determined by the trier of fact, and the lower court agreed, so we tried the case. We tried it as to materiality, and the lower court concluded it was material for two reasons. First, the amounts. All of the parties agreed the amounts at issue were material. All of them did. Even the auditor that had been hired by the general partner agreed that the amounts were material. The judge went further and said, even if the party's decisions about whether or not this is material is not enough, when I look at the project itself at that time, they took more than half of all of the available cash in the years that were at issue. That was equivalent to taking a full month's worth of revenue from the business for themselves. Not profit, not net income, but pure revenue. More than a full month they took for themselves without any authority to do so, but then the The judge said, look, the conduct here, the nature of the conduct is material. We have theft from the partnership. We have creation of documents to mask the theft. Even after the notice of default went in May, they then took out another $60,000. We have theft from low income housing tenants, from their security deposits. The nature of this conduct is abhorrent, and for anybody to stand at a podium and say it's not material to steal from these low income housing tenants, I think is absolutely incredible. Even if the projects were worth a billion dollars, I think if a manager of a low income housing project steals $1,000 payments from tenants, that's material conduct. And I saw in the briefs that there was this question about, well, we don't really know whether or not that took place. The evidence was absolutely clear. In the plaintiff's case in chief, they called a licensed CPA to the stand. The general ledger of the partnership was presented, and he construed it. Zero objections. He walked through the general ledger, which is at Exhibit 43. It's 4,000 pages. Excerpts were presented to the court. The excerpts are in the actual materials that you all have in the appendix. On page 45, you can see in those excerpts that there's a deduct of $11,500 in May of 2019 during the cure period, and there's a control number associated with that transaction. That control number is unique in a general ledger. For every debit, there's a credit. For every credit, there's a debit. When you go find the other side of the deduct from the tenant security deposits, it goes to the affiliate. It goes to the general partner. Now, that was on day two of the trial in the plaintiff's case in chief. They called more witnesses. They rested. We put on our case. They made no rebuttal case at all. The witness that would have known if this money really went towards damage to the units was sitting in the courtroom, the Impro representative. He could have taken the stand. No one called him.  There was a problem with any of that testimony. More importantly, if you think about this cure concept, what's troubled me about this argument from the beginning is that the two-step cure is not some fallacy that we just invent. I called Mr. Barat, pardon me, I questioned Mr. Barat on this issue. I asked him, isn't it true that it takes two steps to cure? First, the general partner pays the money back, all of the money that it took, and then second, the general partner causes the partnership to distribute to the limited partner the money that should have been distributed before, and he said yes. Twice in his testimony, he agreed that that's what it took, and the court concluded that's correct, that's what it took, and that's pretty common sense at Coleman. The cure for stealing is to pay the money back. The cure for not distributing is to distribute. He said, the counsel on the other side said, you got your money, in fact, you got more than you were entitled to. I don't believe we did, and here's why, and here's why. At the time of removal, the general partner then leaves the partnership, and this is where the issue of how they purported to cure becomes so important. Mr. Barat took the stand, and he testified, I cured because I sent the money in, I wired it in from creative choice, it was unencumbered, it was just money that I sent in. You actually heard that just a second ago, but to borrow a term that Judge Newsom used yesterday in the Rosado case, where's the sneaky stuff? There was a lot of it here, and it came up as soon as he finished talking. I began the cross, and then other witnesses came on, and then the documents were presented. The documents in the testimony showed that on June 3rd, Baker Tilley, the accountant that they had hired, emails the partnership and says, you don't have the money to cure. The partnerships don't have it. There's no way to do this. The money's just not there. And so then on roughly the same date, I get correspondence from their counsel, which is after the cure period has elapsed, June 3rd, and it says, we're going to get the partnerships to borrow money in order to pay you. Well, that's another default. The partnerships are not allowed to borrow money, and they certainly can't enter into contracts more than $10,000 without approval, so the letter says they're going to do that. We say, no, you're not allowed to do it that way. You have to actually pay the money back, and then you have to issue the distributions. But then it gets even more interesting, or more stinky, if you will. Defense Exhibit 22 is Yashpal Kakar. He took the stand. He was the manager of the LLC, the equivalent of the president of the general partner. He sends an email to Ashut Kumar. He's the principal at Creative Choice Homes. Mr. Kumar is deceased. This email identifies the source of the cure funds, and it says, and by the way, 91 pages of briefing from the appellants, I don't think they address this email at all. It confirms for Mr. Kumar that the payments have been made to the LPs, and the source is twofold. One, cash on hand, and two, loans by the partnerships. Smoking gun. Now, there's two problems here. It's not just the loan, but the cash on hand is a problem, because you're using 2019 cash to pay 2017 and 2018 distributions, and why does that matter? Because then when 2019 wraps, the money's gone. The money's not there. That's why it's so important to pay the money back. In addition to that, IMPRO testified via interrogatory, under oath, that it loaned the money to the In addition to that, we had Baker Tilly do an audit of the 2019 financials, presented a trial, and its work papers reflect admissions from Mr. Kumar that, in fact, the money was loaned to the partnerships, and we saw in the appellate briefs for the first time a hearsay objection associated with that. Even if it wasn't waived, it was fully admitted by the parties, not for limited purposes at the beginning of the trial. It's an admission against interest. It's a business record. And then we find in the records that after the defaults, they're still taking money. They're still pulling money out, $60,000 after the default notices go. Now, Judge Abadou, you asked a question which I thought was important, and the answer, I think, missed the issue a little bit. The question you asked was, what about the timing? They didn't really respond, and the answer was, well, it was May 3rd, and they have 60 days or 90 days. That's really not accurate. On page 23 of our brief, we walk through all of the different notices. We sent notices March 25 of 19, completely ignored. April 9 of 19, completely ignored. April 15 of 19, completely ignored. May 3rd of 19, completely ignored. It wasn't until after the period ended on June 3rd that they finally responded and said, we're going to cure by defaulting. We're going to cure by borrowing more money to do it. We said no. We send the notice of removal, and then we start to see that they're sending a check to us. So this check comes to us, Judge Newsom, to answer your question about the amounts, and it's just two checks. There's no remittance advice. There's no analysis. There's no waterfall. Not a single book. Not a single record. Not a single spreadsheet has been provided to us. Two checks arrive in the mail after the cure periods have all lapsed. We put them in our trust account, because we didn't know what they were. Literally, just checks showed up. We put them in the firm trust account. Clients didn't get them at all. And so now we know, because of discovery only, that they had borrowed money from other sources. Even Mr. Barat, in his testimony, had to concede that the IMPRO money would have to be repaid, but he didn't consider it a loan, because it would only be repaid if there was cash flow to pay it. Can I ask you a quick question about this piece? Why is it necessarily the case that paying the cure amount with a loan is impermissible? Why is that? There would be nothing wrong with Mr. Barat or Creative Choice taking out a loan to finance. What's wrong is that the partnerships took out the loan. They caused the partnership to incur debt in order to make the payment, because then the partnership has to service that debt, has to pay it back. But why wouldn't that just give rise to another sort of separately actionable breach with a separately actionable cure period? Now I realize we've got this weird kind of like turtles all the way down problem. And you phrased it better than I would, but that's an excellent point. And that's actually what we saw here. It is not true that for 10 years we were perfectly fine with these advances in this theft. We were not. And in the testimony before the court, despite any arguments in the brief, the testimony before the court was that in 2015, the general partner had stolen $340,000. And we went to them and we said, this is not acceptable. And so what did they do? They paid it back. And then they took it back out again. And in fact, you can look at the November of 2019 email. That's the other really, really stinky stuff, Joint Exhibit 66. This is an email between Asha Kumar, who's the principal of Creative Choice, with Sanjay Pramar, who's in pro. He's managing the books and records. And the email says, look, it's November of 2019. I want to clean up the due to and due from affiliate balances on Park Terrace. I want you to make a deposit. I want you to backdate the records to September. And then I'm going to pull the money back out next week. This is his email in November. And so then Mr. Pramar does it. He's all proud. And he says, OK, I've taken care of it. And then Mr. Kumar says, wait, what date did you use? Because Mr. Pramar had not backdated it. And so then he went and backdated it. And when we actually got the general ledgers in the case, they would only give them to us after a motion to compel. And in order to do so, it showed that the payment had been made in September. Mr. Barat testified he thought the cure period ended in September. That's the kind of conduct that the court made the factual findings. It was material. There was no cure. And I haven't had a chance to address forfeiture or the other issues. We stand by our briefing. But this comes to the court after 11 witnesses, four expert reports in lieu of testimony, 120 exhibits, and factual findings. Respectfully, we ask that the court affirm the decision and not reweigh the evidence in any way. Thank you, Mr. Davenport. And before we go back to Mr. Griffith, before we go back to Mr. Davenport. I object, Your Honor. That's OK. So actually, it is relevant to my next point, which is this. Over the last few days, there have been a lot of name pronunciations. I've gotten a few wrong myself, including Mr. Sansoni, counsel on the last case. And I just want to point out that the correct pronunciation of my colleague to the left's name is Judge Abudu. So with that, we will hear next from Mr. Davenport. No need to apologize as long as we all know now going forward the correct pronunciation. Thank you, Your Honor. To your question about optics and getting more money, and very poignant right on spot. And what I hear going on here with respect to how dare someone stand at a podium and argue materiality when people are stealing from tenants, because tenants were not stolen from. They made that case in the lower court. They put in findings of fact, asked the judge to make the finding. The judge didn't make that finding. There was no theft. They didn't prove that. They put some guy up on the witness stand who had judged down in Orlando who was already found not to be a credible witness. We made a strategic decision that we didn't need to cross-examine him on that because it was so bogus. And the Kelly case from the Supreme Court, as cited in our preliminary statement in our rebuttal brief, makes clear. The courts deemed to have consciously declined to make that finding. So when they resort to extreme rhetoric like that, that tells me all I think you need to know relative to the immaterial nature of this. They say stole. Stealing implies the other side doesn't know something is being taken from them. For a decade or more, there were disclosures  The prior owners and controllers of these limited partner positions knew about it. It was fully disclosed. So I would respectfully suggest that the idea that there was theft and stealing is just extreme rhetoric. Materiality. I believe below, materiality was applied to all of the alleged breaches. And I believe that the argument to the contrary now would be raising new issues. But regardless. Although in fairness, right, I mean, I guess as the appellee, he has the luxury of raising new bases for affirming the judgment below. So regardless, if materiality does not apply to some aspect of any of those partnership agreements, we still have the issue of the remedy. We still have the issue of the extreme forfeiture. And we have the equitable powers of the court we respectfully believe were abused. That's a high standard, right? And I mean, I hate saying that about a judge, right? But it's an abuse of discretion power that we are saying was too much. Especially in light of the totality of all of the facts here. So when you say you're just coming in brand new within 60 days of taking over these limited partner positions, removal for course of conduct is underway. There was no loan. They keep saying there was a loan. There was no loan. These monies were wired in from CCH. And then they went out to pay them. The 2019 audited financial statements show very clearly no loan. It's rhetoric. There were email exchanges. Yeah, people were trying to figure out how are we going to fund this? There was discussion of there's going to be a loan. But at the end of the day, there was no loan. That is a fact that cannot be overly glossed over as we've seen here. And again, we still have not heard. How much more money did they need in order for this to be cured? They never analyzed what would be necessary for the cure. One would think if you're going to send a notice of default because someone has been stealing from you and you didn't know about it for years, somebody did an analysis and said, well, how much do they owe us? They never did that. They never even analyzed did the checks satisfy the theft that they claim was so egregious to justify sending people to physically take over control of affordable housing on a Friday before a Memorial Day weekend. Is it true, though, that when they received the check, it wasn't clear what the check was for? If you believe him. You know, if you believe him, right? I mean, there's conversations among counsel to which I was not a party. And the default letter comes in within a couple of weeks. The partnership accountants is being engaged. And they're doing a forensics analysis to take some time. Counsel get on the phone as counsel should say, hey, phone calls go unanswered. Emails go unanswered. On both sides. I can't account for what was happening before the default notices. If he sent a letter, he sent a letter. If somebody didn't respond promptly, maybe they should have. The default notice came in. And then people went to work. And then they went silent. And within six weeks, removal is declared in the middle of one of the cure periods. And then by the end of the second month, the checks go. If anybody suggests that, well, we didn't know what the checks were for, just doesn't strike me as credible, especially when you contend that they've been stealing from you. So with all of that, I would just like to go back to where we started from. Don't believe these breaches were material within the confines of the law, which requires materiality to go to the heart of the deal. And this didn't go to the heart of the deal. There was a cure, despite the obstructionist efforts. And regardless, removal is an extreme force here with Florida law, of course. Thank you for your time, and I appreciate it. I hope you have a great weekend. Thank you, Mr. Davenport. Thank you both. And we will proceed with the next case, which is Sturm.